**FORT WORTH GAS CO. et al. v. BRAGG et al.    (No. 11729.) ***

Court of Civil Appeals of Texas. Fort Worth. April 16, 1927.

Rehearing Denied May 21, 1927.

1. **Appeal and error** ⟠843(2)—On appeal from judgment against gas company and plumbing firm allowing recovery over by latter against former, plaintiff's release given gas company held not to render questions moot.

Where plaintiff, in action for personal injuries, recovered a joint and several judgment against gas company and plumbing firm, which judgment provided for recovery over by plumbing firm against gas company, *held*, on appeal by both defendants, settlement and release given gas company by plaintiff on payment of stipulated sum did not render questions presented by appeal moot, in absence of full showing as to nature of release given.

2. **Release** ⟠29(1)—Release of joint tortfeasor in full settlement releases all joint tort-feasors.

Acceptance of a valuable consideration from one joint tort-feasor in full settlement, satisfaction, and release of a cause of action or damages constitutes a release of all joint tort-feasors.

3. **Torts** ⟠22—Joint tort-feasor may be sued separately, though judgments obtained are regarded as unit, and satisfaction by one releases all.

One injured by inexcusable concurring negligence of two or more wrongdoers at the same time may maintain suit against each or all of the wrongdoers at the same time, and may even prosecute each to judgment, though judgment is regarded as a unit and its satisfaction by one tort-feasor releases all.

4. **Gas** ⟠20(4)—Negligence of plumbers and gas company held for jury.

Evidence of negligence *held* for jury, in action against gas company and plumbing firm, for personal injury caused by explosion of gas in building while changing coal-burning heating plant to gas heating plant.

5. **Appeal and error** ☞1062(2)—**Refusal to submit issue as to proximate cause of injury held not reversible error, where jury specifically found negligence of each defendant was proximate cause.**

In action for personal injuries against gas company and plumbing firm, refusal of requested special instruction by which each defendant sought answer to question whether negligence of the other was the .sole proximate cause of plaintiff's injury *held* not reversible error, where jury specifically found that negligence of each defendant proximately contributed to injury.

6. **Trial** ☞350(6)—**Refusal of special issue, whether it was custom of plumbers to cap open service gas pipes under circumstances, held not reversible error.**

In action for personal injuries against gas company and plumbing firm, caused by explosion of gas in building while changing coal-burning heating plant to gas heating plant, refusal to submit special issues whether it was custom of plumbers to cap open service pipes under circumstances shown in the case *held* not reversible error, in view of showing of negligence.

7. **Customs and usages** ☞15(1)—**Negligence** ☞124(3)—**Evidence of custom is receivable in construing contracts and writings or determining whether acts constitute negligence.**

Evidence of a general custom is often receivable in construing contracts or other writings and in determining whether or not specific acts amount. to negligence.

8. **Customs and usages** ☞7, 8—**Custom must be· legal and reasonable.**

Usage or custom is not good if contrary to law or unreasonable or opposed to well-settled principles of law.

9. **Gas** ☞16—**Plumbers and gas company held equally liable for injury from gas explosion.**

Plumbing firm, leaving service line in building uncapped at night, and gas company, whose employee opened valve in alley causing gas explosion injuring plaintiff, *held* both actively rather than passively negligent and equally liable for resulting injury, and hence not entitled to judgment over against gas company.

10. **Contribution** ☞5—**Neither plumbers nor gas company, both actively negligent and liable for injuries, was entitled to contribution from the other (Rev. St. 1925, art. 2212).**

Neither gas company nor plumbing firm, both actively negligent and chargeable with liability for resulting injury, was entitled to contribution from the other, under Rev. St. 1925, art. 2212.

11. **Appeal and error** ☞1004(1)—**Damages** ☞208(1)—**Damages for personal injuries is primarily question for jury, whose determination will not be reversed except for prejudice or unless shockingly excessive.**

Question of amount of damages recoverable for personal injuries is primarily for jury whose determination, approved by trial court, will not be set aside unless the result of prejudice or improper motive or so excessive as to shock a sense of justice in the minds of the appellate tribunal.

12. **Damages** ☞132(1)—**$25,000 damages for burns from gas explosion held not excessive.**

$25,000 damages for major burns and permanent injury of 37 year old janitor from gas explosion *held* not excessive.

Appeal from District Court, Tarrant County; H. S. Lattimore, Judge.

Action by Henry Bragg and another against the Fort Worth Gas Company and Montrief & Montrief. From the judgment for plaintiffs against both defendants providing for recovery over by Montrief & Montrief against the gas company, both defendants appeal. Judgment for plaintiff affirmed, and judgment for defendant Montrief &·Montrief over against the gas company set aside..

Slay, Simon, & Smith, Thompson & Barwise, B. V. Thompson, and Capps, Cantey, Hanger & McMahon, all of Fort Worth, for appellants.

McLean, Scott & McLean, of Fort Worth, for appellees.

CONNER, C. J. Henry Bragg filed this suit against the Fort Worth Gas Company and J. O. and B. E. Montrief, partners, composing the firm of Montrief & Montrief, to recover damages alleged to have been sustained by him on November 15, 1924, as the result of an explosion of natural gas in the basement of the Ritz Theater building in the city of Fort Worth. He alleged that Montrief & Montrief were engaged in converting a coal burner heating plant into a gas burner heating plant in said theater, and had left an open pipe extending into said basement, through which gas escaped into the basement, and, coming into contact with the fire burning therein, resulted in an explosion which seriously and permanently injured him in the particulars set out in his petition. He further alleged that the gas company was guilty of negligence in turning on the gas at a valve in the alley which had been previously cut off, and that Montrief & Montrief were guilty of negligence in failing to cap said open valve.

The defendant gas company denied the negligence imputed to it, and sought a recovery over against Montrief & Montrief, on the ground that its negligence, if any, was merely passive, producing the occasion of the injury, while Montrief & Montrief were guilty of active negligence in proximately causing the damage.

The defendants Montrief & Montrief alleged that there was a general custom for plumbers to cut off gas and to notify the gas company when work was being done like that in question; that the servants and employees of the gas company opened the valve on·the gas main in the alley with knowledge of the

work that was being done and performed by Montrief & Montrief in the Ritz Theater and with knowledge that the valve in the alleyway had been closed by Montrief & Montrief for the purpose of performing the said installation, that the gas company was negligent in failing and omitting to make a notation on its books and records that work was being performed in the Ritz Theater, and that care should be taken in opening any valve that might be found closed during the progress of the work. Montrief & Montrief averred that the negligence so charged against the gas company was active and that their negligence, if any, was passive, and they sought to recover any amount adjudged against them over and against the gas company.

The case was submitted to a jury on special issues, in answer to which the jury found that the gas company was guilty of negligence as defined in the court's charge in turning on the gas in the alley by the Ritz Theater building on the night of the explosion, and that such negligence was the proximate cause thereof; that Montrief & Montrief's workmen were negligent in leaving the pipe uncapped, from which the gas escaped into the room, and that such negligence was the proximate cause of the explosion; that the explosion was not an unavoidable accident, as that term had been defined in the charge; and that $25,000 would fairly and reasonably compensate plaintiff for the injuries he received as a result of the explosion.

Each of the defendants requested the submission of special issues, which may or may not be hereinafter particularly noticed in the course of this opinion, but which the court declined to submit and entered judgment upon the answers of the jury to the issues submitted in favor of plaintiff against both defendants jointly and severally for the sum of $25,000, with interest from the date of the judgment at the rate of 6 per cent. per annum, and further adjudged that Montrief & Montrief recover of defendant the Fort Worth Gas Company any sum paid by them towards the satisfaction of the judgment in favor of plaintiff Henry Bragg.

The defendants duly excepted to the judgment so rendered, and have appealed therefrom to this court.

On the submission of this case but little opposition was presented to the right of appellee Henry Bragg to recover. As to him, the only material question, to be later discussed, was whether the judgment in his favor was excessive. The main question presented for our determination is which, if either, of the respective appellants, the Fort Worth Gas Company or Montrief & Montrief, is entitled to a judgment over against the other, on the ground, as asserted by each, that the other was the active wrongdoer.

[1] Before entering upon a discussion of the questions involved in these several claims, we should perhaps notice a preliminary contention presented by appellants Montrief & Montrief in reply to the brief filed by the appellant gas company, to the effect that the judgment in favor of the appellee Bragg has, since the trial, been fully settled and discharged by the payment in behalf of the gas company to appellee Bragg of the sum of $10,-000 in satisfaction of all liability on the part of the Fort Worth Gas Company by reason of the explosion which injured Henry Bragg. By reason of such payment it is insisted that the questions presented in this case become moot and unnecessary for a determination on our part. In support of this contention, what purports to be a letter dated November 13, 1926, signed by counsel for appellant gas company, which inclosed a purported contract of November 8, 1926, signed by the appellee Bragg by his attorneys, in which letter Montrief & Montrief are notified that they "are to pay and deposit all recoveries had against them in the Fort Worth National Bank of Fort Worth." The contract recites that Bragg had received of the Fort Worth Gas Company the sum of $10,000—

"in settlement in full of any and all liability on the part of said Fort Worth Gas Company by reason of an explosion in the Ritz Theater building in the city of Fort Worth, Tex., on or about November 15, 1924. * * * And in full settlement of judgment recovered by the said Henry Bragg against the Fort Worth Gas Company on account of said explosion and injury resulting therefrom, * * * said Fort Worth Gas Company is hereby absolutely and fully released from any and all liability to said Henry Bragg. * * * Should the judgment obtained by the undersigned Henry Bragg and by the defendants Montrief & Montrief over and against the Fort Worth Gas Company be affirmed as it now stands, or should it be modified as to amount, and affirmed as to the recovery of Montrief & Montrief over and against the Fort Worth Gas Company, for any amount they might pay, then the above-mentioned $10,-000 shall be in full and final payment and settlement in full of the entire recovery against both the said Fort Worth Gas Company and the said Montrief & Montrief, so that in such event the payment of the above-mentioned $10,000 shall operate as, and be in full release and settlement, both as to said Fort Worth Gas Company and as to said Montrief & Montrief. * * * Should any recovery be had by the undersigned Henry Bragg against Montrief & Montrief, or should any money be collected by the said Henry Bragg for the said Montrief & Montrief, on account of the matters involved in said lawsuit, then such recovery or collection shall be for the benefit and protection of the Fort Worth Gas Company, to protect it against any claims heretofore made or hereafter made against it by the said Montrief & Montrief, and any such recovery had or collection made, when collected, shall be paid into the First National Bank of Fort Worth, Tex., * * * until the final determination of any claim asserted or hereafter to be asserted by Montrief & Montrief against the Fort Worth Gas Com-

pany. * * * Should such case now on appeal be reversed and remanded in its entirety, then the undersigned hereby expressly agrees to dismiss the said Fort Worth Gas Company from said case and to proceed solely against said Montrief & Montrief."

[2, 3] The rule is well established that the acceptance of a valuable consideration from one joint tort-feasor in full settlement, satisfaction, and release of a cause of action, or damages, constitutes a release of all joint tort-feasors. One injured by the inexcusable, concurring negligence of two or more other persons may maintain a suit against each or all of the wrongdoers at the same time, and even prosecute each to judgment, but the judgment is regarded as a unit, and its satisfaction by one tort-feasor has the effect of releasing all others. See Hunt v. Ziegler (Tex. Civ. App.) 271 S. W. 936, and authorities therein cited, affirmed on this point by the Supreme Court in 280 S. W. 546.

The letter and contract referred to and made the basis of the preliminary question presented is not contained in the transcript or statement of facts, but is to be found only on the opening pages of the brief of Montrief & Montrief, and to which appellee Bragg objects and alleges:

That the "purported contract of settlement between appellee Henry Bragg and appellant Fort Worth Gas Company * * * does not speak the truth and facts relative to any settlement between Henry Bragg, appellee, and the Fort Worth Gas Company, appellant, and does not contain the full agreement between Henry Bragg, appellee, and the Fort Worth Gas Company, appellant; * * * that it was expressly agreed, stipulated, and understood between Henry Bragg and the appellant, Fort Worth Gas Company, the said Henry Bragg reserved his right to pursue and collect damages for his injuries from appellant Montrief & Montrief; and that he was only settling with one tort-feasor, Fort Worth Gas Company, and reserving his right to pursue the other tort-feasor, appellant Montrief & Montrief."

In the case of Railway v. Darr, 93 S. W. 166, Chief Justice Fly, of the San Antonio Court of Appeals, quoted with approval from Gilbert v. Finch, 173 N. Y. 455, 66 N. E. 133, 61 L. R. A. 807, 93 Am. St. Rep. 623, the following:

"Where the release contains no reservation it operates to discharge all joint tort-feasors; but where the instrument reserves the right to pursue the others it is not technically a release but a covenant not to sue, and they are not discharged."

It was said in Hunt v. Ziegler, supra, that:

"The rule is settled that a release of this nature, executed to one tort-feasor, has the effect of releasing all of the tort-feasors, jointly and severally liable upon the cause of action, growing out of a tort, unless it clearly appears from the very terms of the instrument that the amount paid thereunder shall only partially satisfy the claims coupled with a reservation of the privilege of pursuing other tort-feasors, in which event the instrument does not constitute a release, but merely a covenant not to sue the tort-feasor with whom the terms have been made."

Neither the brief of appellant Montrief & Montrief nor the brief of appellee Bragg is verified, nor has evidence in behalf of either party been presented on the issue of whether the letter and contract of settlement set out in the brief of Montrief & Montrief constitutes the whole of the agreement. While we are inclined to the view that the letter and contract as exhibited, when considered as a whole, at least tends to show that the right of appellee to continue the prosecution of the suit against Montrief & Montrief was reserved, yet we do not feel prepared to rule that the questions otherwise presented in the briefs may be left undetermined on the ground that they have become moot. On the contrary, we conclude that the rights of the parties, whatever they are, should be left for determination, if necessary, in a court of original jurisdiction, after proof of the agreement and its effect under the terms of article 2212 of the Revised Statutes of 1925 relating to the rights of joint tort-feasors to contribution.

We are thus brought to the vital questions presented on this appeal. The evidence in this case is quite voluminous and cannot be set out fully without unduly extending this opinion. We shall, however, undertake to state its substance and effect. Except as hereinafter otherwise indicated, the evidence without dispute shows that the Fort Worth Gas Company is a corporation engaged in furnishing the citizens of Fort Worth with fuel gas; that Montrief & Montrief are engaged as plumbers; that the Ritz Theater is situated in the city of Fort Worth on Tenth street, between Main and Commerce streets; that Main and Commerce streets extend north and south and Tenth street extends east and west; that the Ritz Theater faces north on the south side of Tenth street; that the gas company maintained a pipe line, to which we shall hereinafter refer as the line of supply, into and through which gas intended for the use of its customers passed. The pipe line referred to, which was buried beneath the surface of the ground some 18 inches or 2 feet, extended along the center of an alley, dividing the block, beside the theater building. In the line of supply in the alley on the west side of the theater building was installed an iron meter box of regular dimensions. In this meter box the gas company placed a cut-off valve down in the ground at the point where the service pipe from the supply line entered the theater building. There was a top on the iron box that lies approximately flush with the alleyway, that weighs from 25 to 40 pounds. On the inside of that box, coming up from the line of sup-

ply, is a valve stem like the stem on a watch, and on the top of the stem is a' wheel. On the particular one in controversy, the wheel was about 12 inches across. The most effective way to cut off the supply of gas and prevent it from passing from the line of supply into and through the service pipe extending into the Ritz Theater was to lift off the top of the iron box, take the wheel and turn it until the valve was closed so that no gas passed from the line of supply into the service pipe. The Ritz Theater building was used by a company which conducted a theater therein and also by two other occupants in separate parts of the building, who, at the time in question, were already customers of the gas company and users of its gas. The Ritz Theater was heated by a coal burner plant.

On or about November 15, 1924, Montrief & Montrief were employed to convert the coal burner plant in the Ritz Theater into a gas-burning plant. They called on Mr. J. H. Stinson, superintendent of the gas company, for the gas meter necessary in making the change. Mr. Stinson had been engaged in the gas business since 1898, had knowledge of the work that Montrief & Montrief were doing in converting the coal-burning furnace of the Ritz Theater building into a gas heater. He knew that the employees under his supervision had knowledge of the arrangement of the service pipe into the building and knew that other tenants in the detached part of the building were using gas for heating purposes. Mr. Stinson testified that in some instances, where there were other users in the building and plumbers were going to install pipes to a furnace, the company required the plumbers to wait for the gas company to shut off the gas so they could make an opening in the line, but, when the gas company thought a plumber reliable, as Montrief & Montrief were considered, the plumber was permitted to cut off the gas in making an opening in the line. On the occasion in question, Montrief & Montrief closed the valve and cut off the gas from the supply line, disconnecting the necessary parts in the supply line, and inserting therein or connecting therewith a 2-inch gas pipe extending from the service line into the furnace room of the Ritz Theater. On the night of the accident, at the completion of the day's work, this 2-inch pipe was left open by Montrief & Montrief, thus affording a free run of gas from the line of supply in the event the valve in the supply line was opened. Mr. Stinson testified that the general custom on the part of plumbers in thus leaving work unfinished was to either plug or cap the open pipe. Mr. B. E. Montrief testified generally as to installing connections and leaving or putting caps on the end of the pipes at the end of the day's work, and said that the general custom was to cut off the gas or water at the source of supply and leave the work open until the same was com-

pleted and after completion to turn on the gas or water. But, in so testifying, we note in this connection that the testimony of the witness was perhaps open to the suggestion urged in behalf of appellant gas company that he was stating the custom where there no other users on the line, or at least not distinguishing between the ordinary case of new work being put in, which was not connected up with the gas supply and in which there would of course be no occasion to plug up the gas supply, and those cases where it was necessary to plug the same up because there were other users on the line who might seek to have the gas turned on. To illustrate, we quote the following question propounded to Mr. Montrief and his answer thereto, to wit:

"Q. Now, I will ask you with reference to the installation, about that character of a job, where there are more than one user, in other words, the premises occupied, whether or not there was a custom and practice general in its nature in the plumbing business and gas-fitting trade with reference to capping or not capping the end of pipes that the plumbers were working on at the end of the day's work, assuming that the plumbers or gas fitters had previously turned off the valve at the gas company's main, when the work commenced? A. Well, the character of the use of the gas—I won't say character, but, if it is cold weather, we would probably make some arrangements to turn the gas on, or, if there were some parties in there that had to run at night, we would make some arrangements to turn the gas on, but in mild weather it would be left off until the work was completed. When I mention 'left off,' I mean turned off."

The witness Stinson testified that he made no entry upon the books or records that Montrief & Montrief had cut off the gas in the alley back of the Ritz Theater building and were engaged in making the necessary connections to change the coal-burning plant in the building into a gas heating plant, although it had books and records and had a card showing each meter and each installation; that he could have gone to the records on the Ritz Theater job and known in advance of the installation of the work that was going to be done and made some sort of a notation thereof for the guidance of other employees of the gas company; that he knew Montrief & Montrief were going to put in the installation at the Ritz Theater and were going to cut the gas line and turn the wheel on the valve and cut the gas off. He further testified:

"It would not have taken any time at all for me to write out a little notation and put it in the gas company's records that this installation was going to be done, the gas company's pipe was going to be cut, and the valve on the gas main shut off. It would not have taken me as long as the fellow putting on the cap. If I had done that, it would have offered some means for Adkins or some other employee in

the service department to have had some knowledge of the same facts that I had."

Mr. Adkins was the night man who took care of the night complaints and occupied the same office at night that was occupied by witness Stinson in the daytime. Mr. Stinson testified that by lifting the receiver of the telephone to his ear and talking through the mouthpiece he could have talked to the main office at the time Mr. Montrief told him they were going to do this installation work. Mr. Stinson further testified:

"I could have called that office down there and given that office notice for its records and guidance that Montrief & Montrief were making an installation in the Ritz Theater, that they had cut off the valve at the gas company's mains in the alleyway, that they had cut into the gas pipe, and that they were taking out the L and putting in a T; I could have called them on the telephone and told them that, but I did not do it. I didn't give Adkins or the shop any notice whatsoever of the knowledge that I had as superintendent of the gas company that that installation work was being done. * * * I could have very easily written out when I quit work on the day of the explosion the knowledge that I had gained from Monte about this installation work and put it on a hook for Adkins' guidance, if I had wanted to. I supposed Monte's men would leave the job intact. Yes; I did suppose wrong at that time. I did not suppose that my man was going down there and cut that wheel on."

The witness J. E. Adkins, night superintendent and "trouble shooter," testified that he was 24 years old; that during the month of November, 1924, he was working for the Fort Worth Gas Company at night and had been working for them about 6 years; that his duties were to answer calls and do whatever was necessary to be done; that he knew that plumbers were working in the Ritz Theater building just prior to the explosion, but that he did not know what they were doing; that on the night of the explosion he got a call from the Ritz Theater Dance Hall that they did not have any gas, that their bill was paid and they wanted him to come up and see about it; that he went to the meters first and found that they were not cut off, and that he went to the alley where the cut-off was and found the gas cut off in the alley; that if he had known that the pipe had been left open he would not have turned the gas on; that he turned on the gas because the manager of the dance hall called and said he was without gas, and, since his bill was paid, he (Adkins) opened the valve in the alley and turned the gas on to the dance hall; that he was the employee of the Fort Worth Gas Company who had notice that the gas had been cut off from the dance hall a short time before the explosion; that at the time in question he came on duty about 5 o'clock in the afternoon; that sometimes Mr. Stinson would be there when he came on duty and sometimes not; that there were hooks there on which Mr. Stinson would leave any instructions for his observation for him to carry out at night; that he looked on the hook that night when he went on duty and did not find any instructions or orders from Mr. Stinson with reference to the installation work that was in progress at the Ritz Theater building, or with reference to the valve in the alley on the gas company's main being cut off during the installation work. This witness further testified:

"The night of the explosion I knew that one of the reasons why the gas valve at the main might be closed was the fact that some of the gas men might be cutting into the main inside of the building. That was one of the reasons. The second reason I knew for the gas valve on the main being closed was for the nonpayment of bills. I did know of two reasons why the valve there on the gas main in the alley might be closed, and I knew that on the night of the explosion. My four years' experience with the gas company had taught me that. When I went down on the night of the explosion and the dance hall man told me his bill was paid, that in my mind eliminated one of the two reasons for my finding that the valve was cut off on the gas main. There was then left within my knowledge one remaining reason why that valve was cut off on the main, and that was the fact that some one on the inside of the building might have cut into the gas line to make some connections; whether I thought about it, I knew that beforehand. I never thought of the second reason; I only thought of the failure to pay the gas bill as a reason. * * *

"You ask me if I would not have gone in there and found out if that second contingency existed. I guess I would have, knowing that I would have expected the end of the pipe capped. Regardless of whether I found it capped or not, I would have gone in there to make the inspection, and, if I had found it uncapped, I never would have turned it on. When I went down there I found there were two meters in there, and I found that they were both open. If the Ritz Theater man's gas bill had not been paid, I would have expected his gas to be cut off at the meter; I would not have expected to have found the gas cut off in the alleyway, because one of the users had not paid his bill. That did not, however, suggest to myself the nonpayment of the bill reason did not exist; the fact that the gas was not cut off at either of the meters, that did not occur to me."

The testimony further showed without dispute that the plaintiff Henry Bragg was the janitor in charge of the Ritz Theater building, engaged at the time in the performance of a duty when the accumulated gas flowing through the uncapped pipe which had been placed in the service pipe by Montrief & Montrief exploded and injured the plaintiff as will hereinafter be more particularly specified.

As stated in the beginning of this opinion, the jury found that the gas company was negligent in turning on the gas in the alley,

and that this was a proximate cause of plaintiff's injuries, and also found that Montrief & Montrief's workmen were negligent in leaving the pipe uncapped, from which the gas escaped into the furnace room, and that such negligence was also a proximate cause of the explosion, and that the explosion was not an unavoidable accident.

Upon the verdict as rendered by the jury, the court, as before stated, entered judgment in favor of appellee Henry Bragg against both the gas company and Montrief & Montrief "jointly and severally" in the sum of $25,000, with interest thereon from the date of the judgment, and further rendered judgment in favor of Montrief & Montrief over against the defendant Fort Worth Gas Company for "any sum paid by them" toward the satisfaction of the judgment. To the judgment so rendered, each defendant excepted. The separate defendants made motions for new trial, which, being overruled, they each have prosecuted appeals to this court.

[4, 5] Each appellant requested a peremptory instruction, which the court refused. We feel no hesitation, however, in approving this action on the part of the court. We think it must appear from the evidence detailed, without discussion, that the verdict of the jury, to the effect that each of the appellants was guilty of negligence which proximately caused the plaintiff's injury, must be approved. Each appellant also requested special instructions in which an answer was sought as to whether the negligence of the other was the "sole proximate cause" of plaintiff's injury. We assume that this issue is more particularly pertinent to the issue of whether the explosion was the result of an "accident," and to an issue submitted by the court, the jury found that the explosion was not the result of an accident. Moreover, the jury in answer to the several issues submitted by the court expressly found negligence on the part of each appellant, and that the negligence of each appellant constituted a proximate cause of the gas explosion and resultant injury, thus precluding any reasonable contention, as we think, that the failure to give such special instructions constituted reversible error. See Northern Texas Traction Co. v. Woodall (No. 11685) 294 S. W. 873, by this court, opinion on rehearing, not yet [officially] published.

[6-8] The appellant gas company also requested the submission of several special issues which sought a finding of whether the "general custom" of the Fort Worth plumbers was to cap an open service pipe under the circumstances shown in this case. But the circumstances so conclusively show negligence on the part of the appellant gas company that no error can be placed upon the action of the court in refusing these instructions. Evidence of a general custom is often receivable in construing contracts or other written instruments, and indeed in determining whether or not specified acts amount to negligence. But it has been often held that a usage or custom is not good if contrary to law or unreasonable or opposed to well-settled principles of law. Railway Co. v. Fagan, 72 Tex. 127, 9 S. W. 749, 2 L. R. A. 75, 13 Am. St. Rep. 776; Theo. Ollesheimer & Bro. v. Foley, 42 Tex. Civ. App. 252, 95 S. W. 688. As already noted, the jury found each appellant guilty of negligence as defined by the court, and such findings, we think, are so conclusively established by the evidence that it would be unreasonable to hold under the circumstances shown in this case that the findings can be set aside on the ground that the court erred in refusing to submit the special issue relating to the subject of custom, relevant only to the issue of negligence.

[9] Upon the issue of which, if either, appellant was guilty of active negligence, as contradistinguished from passive negligence, no finding of the jury is to be found in the record. The court, however, entered his judgment in favor of Montrief & Montrief against the gas company for any sum that they might be required to pay towards the satisfaction of the judgment in favor of plaintiff Bragg, from which a finding on the part of the court in favor of Montrief & Montrief on this issue must be implied. The several counsel have cited numerous cases in support of their conflicting contentions, but in the interest of brevity we will only review a few of them which we think will sufficiently illustrate the principles of law involved.

The case of City of San Antonio v. Talerico, 98 Tex. 151, 81 S. W. 518, was one where Talerico stepped in a hole which the city had negligently allowed to exist in a sidewalk on one of its streets in front of St. Joseph's Orphan Asylum. The city caused the asylum to be made party defendant, and sought a judgment over against it, alleging that the hole in the sidewalk was caused by the action of the asylum. The trial court, as well as the Court of Civil Appeals, held that the city could not recover against the asylum but the Supreme Court, in reversing the case, used the following language:

"We think it clear that a general demurrer was improperly sustained. The pleading showed that the St. Joseph's Orphan Asylum was the original and active perpetrator of the wrong for which the city, without participation therein, but only by reason of its passive negligence, was sought to be held responsible. A case was made for impleading the party thus primarily liable."

In the case of S. W. Tel. & Tel. Co. v. Krause (Tex. Civ. App.) 92 S. W. 431, the telephone company cut the fence of the railway company's right of way, and plaintiff's cattle entered on the right of way and were injured. The railway company was held li-

Tex.) FORT WORTH GAS CO. v. BRAGG 251
(297 S.W.)

able to the plaintiff, but the court held that the railway company was entitled to judgment over against the telegraph company. We quote from that case as follows:

"As to proximate cause, we are of opinion that the loss of plaintiff's cattle resulted proximately from both the act of·cutting the fence, and the absence of cattle guards at the proper place. They or either of them could be taken as the proximate cause. The contention of·the railway company appears to be that the act of cutting the fence was an independent cause, intervening between the neglect to have cattle guards, and the escape of the cattle, sufficient to constitute the sole and efficient cause, and therefore the absence of cattle guards was too remote to be the responsible cause. In our view both causes operated directly to bring about the result, though they were separate acts or omissions. * * *

"The act of the servants of the telegraph and telephone company done in the performance of the work rendered it liable for the proximate consequences. We really see no good reason for not holding it liable to plaintiff. But plaintiff does not complain of this. The telegraph and telephone company complain of the judgment over against it in favor of its codefendant. It invokes the rule that the law recognizes no contribution between wrongdoers. The rule applies where there has been a joint and active wrongdoing. The rule is not applicable to a case in which one defendant is the active wrongdoer and the other is held by reason of its passive negligence. City v. Talerico [98 Tex. 100] 81 S. W. 520; City v. Smith, 94 Tex. 266, 59 S. W. 1109. No injury would have been occasioned plaintiff, but for the cutting of the right of way fence. The telegraph and telephone company was the primary wrongdoer and primarily liable."

In Austin Electric Co. v. Faust, 63 Tex. Civ. App. 91, 133 S. W. 449, it appears that Faust instituted suit for damages for personal injuries occasioned by a collision between a car of the electric company and a wagon and team of the Austin Ice Company, whereby the team was frightened and caused to run away and against a buggy in which plaintiff was sitting at the time. The electric railway company and the ice company each alleged that the negligence of the other was the proximate and sole cause of plaintiff's injuries, and in addition the ice company asked for judgment over against the electric company. The court sustained a general demurrer to said cross-action. The jury found that both parties were guilty of negligence as alleged in plaintiff's petition, and judgment was rendered against both companies. The Court of Civil Appeals affirmed plaintiff's judgment against both defendants, and reversed and remanded the case for the purpose of trying out the issues as between the electric railway company and the ice company, holding as follows:

"As we understand the law, where one party has, by his negligence brought about a condition, and another party is guilty of negligence in not recognizing and acting upon such condi-

tion, and a third party, without negligence, is injured by reason of the joint negligence of the two parties, he may recover against both; and, as between the injured innocent party and the joint wrongdoers, there will be no inquiry as to the comparative negligence of the two, and no apportionment of damages based on such comparison. In such case, the negligence of both of the parties is the proximate cause of the injury to the innocent party. But as to the two negligent parties, if the negligence of one was merely passive, or was such as only to produce the occasion, and the other negligent party was the active perpetrator of the wrong, the former may recover over against the latter. As between the two negligent parties, the negligence of the active perpetrator of the wrong would be the proximate cause of the injury to the party whose negligence did no more than produce the condition. City of San Antonio v. Smith, 94 Tex. 266, 59 S. W. 1109; City of San Antonio v. Talerico, 98 Tex. 151, 81 S. W. 518; Kampmann v. Rothwell, 101 Tex. 540, 109 S. W. 1089, 17 L. R. A. (N. S.) 758."

In the case of City of Weatherford Water Light, & Ice Co. v. Veit (Tex. Civ. App.) 196 S. W. 986, cited in behalf of the appellant Montrief & Montrief, as perhaps more nearly in point than any other case, it appears that Veit brought suit for damages against the ice company, which in turn impleaded the telephone company by which Veit was employed, and prayed for judgment over against it in case of recovery by the plaintiff. The plaintiff's allegations of negligence against the ice company were substantially that it had erected and maintained its pole supporting a high-tension wire in close proximity to the telephone pole; that the high-tension wire of the power company had been fixed upon the inner instead of the outer portions of the crossbar, which was carrying the power company's wires; that, in maintaining said high-voltage wire in such proximity to the telephone pole, the power company, in order to prevent its high-voltage wire from coming in contact with the telephone pole, had attached to the telephone pole a bracket, which had the result of placing the wire but a few inches from the telephone pole,' a few inches below an iron step on the telephone pole. The power company's allegations of negligence were as follows: That the light wire had been attached to the bracket fixed to the telephone pole for the protection of the telephone pole, and had been long known to the telephone company; that there was an agreement between the power and telephone companies whereby the power company would shut off the current of electricity upon its wires when employees of the telephone company were required to make repairs upon its wires; that upon the occasion in question the telephone company knew that it was dangerous for the plaintiff to ascend the telephone pole, and, so knowing, it should have made a request for the electric light current to be cut off;

and hence it was negligence on the part of the telephone company to so erect its pole and direct repairs without such request.

The jury found that the power company was guilty of negligence in the manner in which it carried its high voltage wire upon its crossbeams, in attaching its high-voltage wire to the telephone pole, and in maintaining it without insulation, and that each of these acts of negligence proximately caused plaintiff's injuries. The jury also found that the telephone company was guilty of negligence in the particulars charged, which proximately caused or contributed to cause the injuries suffered by plaintiff Veit. The trial court entered judgment for the plaintiff against the power company, but denied recovery over against the telephone company, and the power company appealed. This court, in disposing of the case, among other things, said that:

"It is true that under the evidence and the findings both the light company and the telephone company were guilty of negligence in the particulars charged, which proximately contributed to the injuries suffered by the appellee Veit; * * * that the undisputed evidence shows that the telephone company, and not the light company, was the active wrongdoer. * * *

"It was the duty of the telephone company undoubtedly to furnish its said employee with a safe place to work, and it was active negligence on its part to send such employee into the dangerous position up among its wires without specific warning of the location and uninsulated condition of the high-voltage wire with which Veit came in contact, and without notification to the employees of the light company that it (the telephone company) was about to repair its lines and to request that the light company, as the evidence shows it would have done, cut off its current. On the part of the light company the negligence seems merely passive. In maintaining its uninsulated high-voltage wire as it did do upon the telephone pole it merely created the dangerous condition. The wire might have so remained and been maintained without injury to any one indefinitely in the absence of necessity on the part of the telephone company to repair its wires, and for one of its employees to ascend that particular pole, and so the dangerous condition might have remained harmless by due warning on the part of the telephone company to its employees when directed to ascend the pole, or the dangerous condition might have been entirely removed by a request to cut off its power. * * *

"We therefore are of opinion, as before stated, that, as between the light and telephone companies, the latter was the active wrongdoer, and that under the undisputed facts the light company was entitled to judgment as it prayed for over against the telephone company."

Numerous other authorities with extended discussion are presented in the briefs of counsel, but we think the authorities to which we have referred will sufficiently indicate the general import of the cases, and, after as patient consideration as we have been able to give the case, we have concluded that, in harmony with the principles of law applicable the undisputed evidence and the jury findings show that each of the appellants was guilty of active negligence which proximately brought about plaintiff's injuries. This is specially true of the gas company and also true of Montrief & Montrief, even though (if it be so admitted) the negligence of Montrief & Montrief may be less in degree than that of the gas company. As said in both the cases of Electric Co. v. Faust and City of Weatherford v. Veit, supra, the question is not one of a difference in degree, of comparative negligence of the parties, but a difference in the character of the acts or wrongs which resulted in an injury to some third person. We think the acts and omissions of Montrief & Montrief amounted to something more than mere passive omission, or negligence which created a condition rendering them blameless as between themselves and the gas company, and which hence entitled them, to a judgment over. The acts and omissions of Montrief & Montrief were positive and active and affirmative, and actively co-operated with the negligent acts of the gas company in bringing about the explosion and consequent injury to Henry Bragg. This being true, as we conclude, the court erroneously gave judgment as he did in favor of appellant Montrief & Montrief over against the appellant gas company. Upon the face of the authenticated record as presented to us, neither appellant is entitled to contribution from the other except as given under the terms of article 2212, Rev. Statutes, which modifies in this state the pre-existing law relating to contribution among joint tort-feasors. The statute referred to reads as follows:

"Any person against whom, with one or more others, a judgment is rendered in any suit on an action arising out of, or based on tort, except in causes wherein the right of contribution or of indemnity, or of recovery, over, by and between the defendants is given by statute or exists under the common law, shall, upon payment of such judgment, have a right of action against his codefendant or codefendants and may recover from each a sum equal to the proportion of all of the defendants named in said judgment rendered to the whole amount of said judgment. If any of said persons codefendant be insolvent, then recovery may be had in proportion as such defendant or defendants are not insolvent; and the right of recovery over against such insolvent defendant or defendants in judgment shall exist in favor of each defendant in judgment in proportion as he has been caused to pay by reason of such insolvency."

[10] Appellants, under the circumstances of this case, do not come within the exception specified in the article, and hence their rights to contribution are as given in the general terms not included in the exception. It would seem, therefore, that either appellant which, under the terms of this decree may be

compelled to pay more than an equal amount in the discharge of this judgment, will be entitled to contribution over against his or its codefendant.

[11, 12] The judgment in favor of Henry Bragg is assailed as excessive. The question of amount is one primarily and peculiarly within the power of the jury to determine, and the jury's determination in this case has been approved by the trial court. In the absence of circumstances tending to show that the verdict was the result of prejudice or other improper motive, or of some circumstance indicating that the amount fixed was not the result of a deliberate and conscientious conviction in the minds of the jury and court, or so excessive as to shock a sense of justice in the minds of the appellate tribunal, the judgment as to amount should be sustained. Henry Bragg testified, among other things, that he was about 37 years old, and at the time of the explosion serving as footman, porter, and janitor at the Ritz Theater; that after an intermission in the performance at the theater he went into the basement, to a special place assigned, for a change of his uniform; that, after he had pulled off his uniform and was standing there, a white blaze came that covered him and swept him off his feet; that he was hit over the head with falling timber, brick, and dirt; that his eyes were blinded and felt full of something hot; that he was blown about 15 feet and landed on his back; that his back is still troubling him; that he sometimes broke out with running sores; that Mr. Jack O'Brien and Mr. Howard Sale rescued him, and that all he remembered was that he came to his senses again in the hospital where he was treated by Dr. McKee and Dr. Littlepage; that Dr. McKee still treated him; that before the explosion in question his eyes were always good; that since they are in a bad condition; that he has cloudy vision as though looking through a wet windshield; that the sun blinds him, and that he has to stay in a dark room until late in the evening; that his eyes burned; that "I am nearly teetotally blind; I suffer pain very badly from my eyes." He further testified that he was injured in the right arm; that it was dead, as though asleep; that he cannot "attach" anything; that he had not sufficient grip to hold anything; that there was a deep burn on the largest muscle which swells up at times and breaks out in large running sores, which occurs about once every 20 days, unless medicine is constantly applied; that he was "banged up" so badly over his kidneys they did not perform their normal function; that his manhood was destroyed; that he has trouble with his back, which pains him "awfully bad"; that his head, as the result of falling brick, timber and iron, gives him severe pain; that since his burn he had been unable to do any physical labor, for the reason that his vision was bad; and that he could not produce power in his hands enough to grab small articles.

Howard Sale testified as follows:

"I saw the plaintiff Henry Bragg on the night of the explosion. I saw him there at the theater building both before and after the explosion. When I saw Henry Bragg after this explosion his whole back was on fire, and he was holloing. Jack O'Brien and I went down into the basement and brought him up the steps and laid him down in the alley and fought the fire out. We knocked the fire out with our caps, and as we would try to pull away pieces of the burning clothes, pieces of flesh as big as your finger would roll up and come off of him."

Jack O'Brien testified as follows:

"When I first saw Henry Bragg after this explosion he was in the basement, and he was ablaze all over; he was a literal ball of fire. Howard Sale and I undertook to put out the fire and rolled him on the floor and finally dragged him to a place in the alley. As we were undertaking to tear the burning clothes from him, pieces of flesh would come off. * * * When I saw Henry Bragg after this explosion, he was suffering great pain; he was in agony and writhing like a snake, and holloing."

Dr. Frank McKee testified:

"My name is Dr. Frank McKee. I am a graduate of Paylor Medical School of Dallas, Tex., and have been practicing my profession since 1919. I have had occasion to treat the plaintiff in this case, Henry Bragg. The occasion for that was when they brought him in on an emergency case, with a severe burn, the night of November 15, 1924. Since that time I have treated him the best I could. As to the number of times that I have treated Henry Bragg, I would have to refresh my memory on that. Practically every day when he had his burns, and then every other day, until I had him to come to the office, and then every three or four times from then on. With reference to a description of his condition from the time I first saw him and examined him and treated him, from that time on, I will state that the night that they brought him into the hospital, he was suffering great pain from a general burn. From first glance he was burned, it looked like to us, practically all over; he was burned from the top of his head, face, neck, back, clear down to his buttocks, the left arm, the left forearm, and the right arm, and his bag, the scrotum, which is the bag which holds the testicles. There were also a few minor burns on his lower extremities, and several bruises across his thigh, and across the front of his abdomen. * * * I could not say just how much he is permanently injured, but in my opinion, he is permanently injured."

We think this evidence justifies the verdict, and hence overrule the assignment attacking the judgment as excessive.

There are other assignments and propositions that have not been noticed particularly, but they have been examined and will be overruled without discussion, this opinion being already extended to greater length than we desire.

We finally conclude for the reasons stated that the judgment in favor of plaintiff Henry Bragg should in all things be affirmed; that the judgment in favor of appellant Montrief & Montrief over against the gas company should be set aside; that the right of contribution between the appellant gas company and the appellants Montrief & Montrief should be adjudged as provided in article 2212, quoted above, without prejudice, however, to the right of the parties to determine the suggested issue of whether the judgment in favor of the plaintiff Bragg has been wholly discharged, as asserted in the brief presenting the moot question noticed in the beginning of this opinion.